UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
Sofia Shums,                                          :
                                                      :
                          Plaintiff,                  :           **<u>OPINION AND ORDER</u>**
                                                      :
                    -against-                         :           04-CV-4589 (DLI) (LB)
                                                      :
New York City Department of Education                 :
and Marilyn Alesi,                                    :
                                                      :
                          Defendants.                 :
------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

In this lawsuit, plaintiff Sofia Shums, a former teacher of English as a Second Language ("ESL") at P.S. 129 in Queens, alleges that defendants New York City Department of Education ("DOE") and Marilyn Alesi ("Alesi"), the principal of P.S. 129, illegally terminated her from her teaching position because of her national origin and in retaliation for a letter plaintiff wrote that was protected speech under the First Amendment to the United States Constitution. In her amended complaint, plaintiff claimed violations of 42 U.S.C. § 1983 ("Section 1983"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and city and state anti-discrimination laws. In a decision dated March 31, 2006, the court dismissed plaintiff's city and state law discrimination claims, as well as plaintiff's Title VII claim against Alesi.[1] *Shums v. New York City Dep't of Educ.*, No. 04-CV-4589, slip. op. (E.D.N.Y. Mar. 31, 2006). Defendants now move for summary judgment on plaintiff's remaining claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion is granted in its entirety.

---
[1] Plaintiff originally filed the action *pro se*. Plaintiff is now represented by counsel.

# I.    Background

Plaintiff was born in India and is of Indian national origin. Plaintiff is Muslim and her native language is Urdu. Prior to moving to the United States in 1973, plaintiff received two Bachelor's and two Master's Degrees from Bombay University in India. Plaintiff received Master's Degrees in Guidance and Counseling from Central Michigan University in 1974, and in Teaching English to Speakers of Other Languages from Michigan State University in 1982. Plaintiff also worked on a doctorate in English at Michigan State University, but did not receive a doctorate degree. In 1988, plaintiff commenced employment with the Board of Education of the City New York, now operated as defendant DOE. Initially hired as a substitute, plaintiff obtained her permanent teaching license as an English as a Second Language ("ESL") teacher in 1989. Between 1989 and 1998, plaintiff worked at several different DOE-operated schools in Brooklyn until June 1998, when plaintiff applied for, and received, a transfer into School District 25, which covers parts of Queens.

Within the first few months of the 1998-99 school year, plaintiff was assigned to teach ESL in two elementary schools, P.S. 29 and P.S. 129. Plaintiff continued to split her time between the two schools during the 1999-2000 school year, when Alesi became the principal of P.S. 129. Beginning with the 2000-01 school year and lasting until her suspension at the end of the 2002-03 school year, plaintiff taught ESL full time at P.S. 129. The incidents underlying this litigation all occurred at P.S. 129 between 1999 and 2003, while plaintiff served as an ESL teacher, and Alesi served as principal.

### A.    The 1999-2000 School Year

In September 1999, Alesi was appointed the acting principal of P.S. 129. At that time, and during the entire 1999-2000 school year, plaintiff taught ESL at P.S. 129 during the

morning, and at P.S. 29 during the afternoon. Plaintiff states that her first negative encounter with Alesi occurred in March 2000, while plaintiff was reviewing student test papers in the faculty lounge at P.S 129. Plaintiff states that Alesi entered the lounge, stood over her, and asked in an accusatory tone, "What are you doing, Ms. Shums?" According to plaintiff, after she explained to Alesi that she was transferring student answers onto the answer sheet because some of her younger students were unable to transfer the answers themselves, Alesi turned around and left the faculty lounge without saying anything in response. Plaintiff states that this exchange upset her very much, and that she was "absolutely taken aback" by Alesi's inquiry because she felt that Alesi was accusing her of something of which she was not guilty. (Shums Dep. 91.)

On April 5, 2000, Alesi performed a classroom observation of plaintiff's kindergarten group. Pursuant to DOE policy, before observing the lesson, Alesi held a pre-observation conference with plaintiff during which plaintiff described her intended lesson plan. Alesi's report from the observation, which was sent to plaintiff and placed in her personnel file, commended certain aspects of plaintiff's lesson and recommended improvement in others. Under the "Commendations" section, Alesi praised plaintiff's friendly relationship with her students, her incorporation of poetry into her lessons, and her use of flip-books as learning aides. Under the "Recommendations" section, Alesi stated:

> While I commend you for using poetry, it would have been more beneficial for the children to look at a picture book while you read. Some of the vocabulary in the poem might have been too difficult for the children to comprehend, without pictures.
>
> It is important for children without a good command of the English language to speak to and with each other. Too many of your questions are of the 'Yes-No' variety. Children should be encouraged to answer in full sentences, and relate to each other.
>
> You did most of the talking during the lesson. The children need to respond and have time to think of a response to questions. Multiple questions can be

confusing. A simple direct question, eliciting a response in sentence form, is necessary.

(Barnett Decl. Ex. E.) Alesi's observation of plaintiff led her to conclude that plaintiff had given her students "a marginally satisfactory lesson, which merits a satisfactory rating." (*Id*.) In addition to rating plaintiff's April 5 lesson as "satisfactory," Alesi gave plaintiff an overall satisfactory rating for the 1999-2000 school year.

B.     The 2000-01 School Year

Plaintiff began teaching full-time at P.S. 129 at the beginning of the 2000-01 school year. Sometime in October 2000, plaintiff attended a meeting with Alesi and Kathryn Mamounis ("Mamounis"), the ESL supervisor for District 25. At that meeting, Alesi and Mamounis criticized plaintiff's work and teaching skills. According to plaintiff, Alesi and Mamounis spent the entire meeting verbally "berating" and "attacking" plaintiff, and telling her that she "was not fit to be an [ESL] teacher." (Shums Dep. 244-45.) Either at the meeting, or shortly thereafter, Alesi and Mamounis presented plaintiff with a professional development plan. The provisions of the professional development plan were detailed in a letter, dated October 25, 2000, sent from Alesi to plaintiff and placed in plaintiff's file. The letter indicated that plaintiff was to meet each week with either Alesi or Dr. Lyn Schecter, the assistant principal of P.S. 129, to review plaintiff's lesson plans and classroom materials for age and reading level appropriateness. In the letter, Alesi also indicated that she would "set up intervisitations and staff development both within [P.S. 129] and other schools to help [plaintiff] observe model lessons." (Barnett Decl. Ex. G.) The letter further instructed plaintiff to "focus on reading, writing, listening, speaking and viewing in a differentiated setting with materials appropriate to the level of proficiency of the students." (*Id*.) Pursuant to the professional development plan, plaintiff observed a lesson given by an ESL teacher at another school.

Also in October 2000, plaintiff attended a staff development presentation in the library at P.S. 129. According to plaintiff, because of the library's limited space, she was forced to sit in a position during the presentation that did not directly face the presenter. To avoid craning her neck, plaintiff did not keep her eyes on the presenter throughout the entire presentation, and at times, listened to the presentation with her eyes closed. Plaintiff states that Alesi spoke with her shortly after the presentation because Alesi had received a complaint that plaintiff had closed her eyes during the presentation. According to plaintiff, Alesi told plaintiff that it was inappropriate for her to close her eyes when she was being spoken to, and that Alesi would be observing plaintiff's class to ensure that plaintiff's students were following the "norms." Plaintiff alleges that over the next several months, Alesi repeatedly directed her to look at Alesi when Alesi was speaking to her and made statements to the effect of: "here we look people in the eye when we speak" and "[t]his is how you to do it here . . . you must look a person in the eye when a person is speaking to you." (Shums Dep. 234.) Plaintiff also alleges that Alesi explicitly asked plaintiff whether plaintiff was capable of teaching ESL to her students if plaintiff did not herself follow the cultural norm of making eye contact. Plaintiff claims that these type of comments continued until February 2001, when in a post-observation conference, Alesi asked plaintiff why she was turning her face away from Alesi, and plaintiff responded—"[i]n an attempt to get [Alesi] to stop"—that it was against her religious belief to make eye contact. (Shums Aff. ¶ 14.) After plaintiff offered this explanation, Alesi ceased commenting to plaintiff on the subject of eye contact.

On April 26, 2001, plaintiff met with Alesi and a union representative to investigate an allegation of corporal punishment made against plaintiff by a parent. Specifically, the parent alleged that plaintiff threw books at children and physically put children into seats. According to

a letter dated April 27, 2001 sent from Alesi to plaintiff, plaintiff explained at the meeting that she occasionally "need[ed] to physically direct students to their seats for safety reasons and because of the fact that many children do not understand the English language." She added, "the small size of [her] classroom sometimes cause[d] [her] to toss books onto students' desks." (Barnett Decl. Ex. I.) After meeting with plaintiff and conducting an investigation, Alesi concluded that corporal punishment did not occur. (*Id*.) In her letter to plaintiff, however, Alesi did express concern about any use of physical contact by plaintiff to deal with student misbehavior. Alesi encouraged plaintiff to avail herself of professional development opportunities offered by the school district in the areas of behavior management. The letter also directed plaintiff to make arrangements to use the student lunchroom or another teacher's classroom to teach her second grade group, as plaintiff had stated that size of her current classroom was too small. (*Id*.)

C.     The 2001-02 School Year

Shortly after the 2001-02 school year began, Alesi sent plaintiff a schedule setting forth the instruction times for plaintiff's students. After receiving the schedule, plaintiff complained to Assistant Principal Karen Zuvic ("Zuvic") that the schedule did not allow for sufficient time to provide state-mandated services to the ESL students. Several days later, Alesi prepared a second schedule. This second schedule appeared to provide the requisite time for ESL instruction, although plaintiff was concerned that it did not account for the time needed to transport students from their regular classrooms to the ESL classroom. On or about October 3, 2001, plaintiff asked Zuvic for additional chairs for one of her classes because the second schedule was unclear to her. After this request, Alesi called plaintiff into her office and, according to plaintiff, Alesi then held the schedule up in front of plaintiff, "jabbed her finger on the paper close to

[plaintiff's] chest," and said something to the effect of, "You can't even read. You don't know how to read." (Pl. Am. Compl. ¶ 13; Shums Aff. ¶ 20.)

### 1.    Plaintiff's Letter of October 14, 2001

Over the next several days, plaintiff followed Alesi's teaching schedule, but quickly became concerned that her students were not receiving the requisite amount of ESL instruction. To highlight these concerns, plaintiff wrote a letter, dated October 14, 2001, that was addressed to Mamounis, and copied to Alesi and Michelle Fratti, the Superintendent of District 25. In sum, the letter stated that the schedule did not provide plaintiff's students with the legally required amount of instruction because it failed to account for the time it took to pull students out of their regular classrooms and situate them in plaintiff's instruction area. Additionally, plaintiff complained in the letter that the schedule required her to give up part of her lunch period in order to transport students back to their classrooms, she was not allowed an administrative period, and the assigned classroom was too small for her and her students' needs. In her deposition, plaintiff stated that her duties as an ESL teacher required her to ensure that her students received the requisite amount of state-mandated ESL instruction. In an affidavit submitted in opposition to the present motion, plaintiff clarifies that, although she saw it as her "moral duty" to help her students in any way that she can, she "was never advised by the defendants that [she] was required as part of her official duties to report violations of the [ESL program requirements] to the District's central administration." (Shums Aff. ¶ 27.)

In response to plaintiff's letter, Mamounis and Alesi conducted a meeting with plaintiff on October 22, 2001 to discuss plaintiff's concerns. On October 28, 2001, Alesi sent plaintiff a letter addressing those concerns. In pertinent part, the letter stated that: (1) Mamounis would provide plaintiff with a staff developer to help organize plaintiff's program and minimize the

amount of time that it took plaintiff to pick up her students from their regular classrooms, (2) plaintiff could use a larger classroom on the first floor of the building to accommodate her larger classes, (3) plaintiff could drop off some of her students with a lunchroom aide, (4) plaintiff could use an adjusted dismissal time for certain students, (5) plaintiff, as an ESL teacher, was not entitled to an administrative period, and (6) Zuvic would assist plaintiff in organizing her classroom. In her deposition, plaintiff acknowledged that Alesi's letter addressed many of the concerns that she had raised in her October 14 letter. In addition to Alesi, Mamounis and Anne Marie Iannizzi ("Iannizzi"), Special Assistant to Superintendent Fratti, also responded to plaintiff's October 14 letter, and indicated that plaintiff's concerns more appropriately should have been addressed to plaintiff's immediate supervisors at P.S. 129, such as Alesi and Zuvic.

In her deposition, Alesi stated that when she first received plaintiff's letter, she felt that it was "an exaggerated letter with many inconsistencies and certainly a lot of things that she ha[d] said in the past . . . regarding an administrative period which we'[d] already addressed." (Alesi Dep. 162.) Alesi also stated that plaintiff's letter was "outrageous," "comical" and "invalid in many ways." (*Id*. at 73.) In the end, however, Alesi stated that "[t]he letter was something that eventually turned out to be a good thing because . . . because we got another [ESL teacher] in the building." (*Id*. at 161.) Alesi claims that she expressed this latter sentiment to plaintiff, although plaintiff disagrees that such an exchange occurred.

## 2. The November 9, 2001 and February 15, 2002 Classroom Observations

On November 9, 2001, Mamounis conducted a formal classroom observation of one of plaintiff's instruction periods. Plaintiff states that although Mamounis had never formally observed a lesson of hers before, Mamounis had informally observed one of plaintiff's lessons at P.S. 29 during the 1999-2000 school year. Although it was not at all unusual for Mamounis,

who was plaintiff's supervisor, to observe a teacher's lesson, Mamounis stated that the November 9 observation was performed at Alesi's request. (Mamounis Dep. 853-54.)

In her report from that observation, dated December 10, 2001, Mamounis commended plaintiff for using a variety of reading materials in her lesson and using certain visual aids, but criticized plaintiff for failing to follow her intended lesson plan, failing to elicit meaningful answers from her students, using ineffective visual aids, and asking students to compare books they had never read. Mamounis's report also indicates that at her post-observation conference with plaintiff, plaintiff invited Mamounis to observe another of her lessons so that Mamounis would have a more accurate impression of plaintiff's teaching abilities. According to the report, when Mamounis suggested that plaintiff could work with the District's ESL staff developer to prepare for the next lesson that Mamounis would observe, plaintiff replied that she was "a skilled ESL teacher and did not need assistance, but would do whatever was required." (Barnett Decl. Ex. N.) Mamounis ultimately concluded that plaintiff had given an unsatisfactory lesson, and indicated that she would meet with Alesi and plaintiff on December 18, 2001, to design a plan to assist plaintiff in preparing and implementing an instructional program that would meet the needs of plaintiff's students more effectively. Plaintiff states that when she attended that meeting and attempted to take notes, Alesi yelled at her to put down her pen and stop writing. Plaintiff claims that when she insisted on taking notes, Alesi responded with words to the effect of, "I'm going to call my attorney. And if you misquote me, I will sue you." (Shums Aff. ¶ 30.)

Following the December 18 meeting, Alesi and Mamounis developed a Professional Development Plan for plaintiff that identified weaknesses in plaintiff's teaching performance and made suggestions for improvement. This plan was communicated to plaintiff in a letter sent by Mamounis dated January 7, 2002. The letter indicated that the District's ESL specialist would

be assigned to work with plaintiff in weekly meetings to assist plaintiff in planning her lessons. The letter indicated that the focus of these meetings would be on "differentiating instruction to meet the needs of [plaintiff's] English language learners (ELLs)" and creating "strategies for facilitating the development of listening and speaking skills for ELLs." (Barnett Decl. Ex. O.) A subsequent undated summary of the Professional Development Plan indicates that plaintiff attended four such meetings, and was absent for one. Mamounis's January 7 letter additionally instructed plaintiff to attend several school-sponsored educational workshops and notified plaintiff that Mamounis would conduct a formal observation of plaintiff's class on February 15, 2002.

Mamounis performed the classroom observation on February 15, 2002, and detailed her findings in a report dated February 21, 2002. (Barnett Decl. Ex. Q.) In that report, Mamounis commended plaintiff for her use of visual aids, her adaptation of the lesson to support students of varying levels of language proficiency, and her adaption of reading materials to support English language learners. Mamounis also made several suggestions in the report regarding time management and possible methods to foster greater student participation. Ultimately, Mamounis gave plaintiff's lesson a satisfactory rating.

### 3.     The Failure to Provide ESL Instruction to K.I.

In January 2002, Alesi spoke with plaintiff about a student with initials "K.I." who had transferred into P.S. 129 in September 2001, but had failed to receive the ESL services to which he was entitled. In a letter to plaintiff's file dated February 6, 2002, Alesi discussed the results of her investigation into this failure. (Barnett Decl. Ex. P.) Plaintiff concedes that she bore partial responsibility for the situation. Specifically, plaintiff acknowledges that after K.I.'s teacher, Ms. Cain, told plaintiff of a student that was having difficulty speaking and

understanding English, plaintiff was obligated to determine whether that student was entitled to receive ESL instruction, and if so, to provide him with that instruction. When Ms. Cain approached plaintiff, however, plaintiff told her that she was too busy to speak with her at that time. Plaintiff did not speak with Ms. Cain again and she claims that the conversation "slipped [her] mind." (Shums Aff. ¶ 37.)

Plaintiff eventually became aware of K.I. while preparing a list of ESL students exempt from city-wide testing. According to plaintiff, while in the process of compiling the list, she came across K.I.'s records and determined that he "was a transfer student that had evidently fallen through the cracks at his previous school." (*Id.* at ¶ 38.) Plaintiff then tested K.I., determined that he was entitled to receive ESL instruction, and sent a note to Alesi and Zuvic dated January 9, 2002, indicating that K.I., along with two other students, had tested into the ESL program. Alesi responded to plaintiff by writing on the note, "Children must be picked up – thanks." (Lower Decl. Ex. 2.) Plaintiff states that she was not called into meet with Alesi about the issue until January 15, 2002. Although plaintiff admits that she was partially responsible for failing to provide K.I. with ESL instruction, she alleges that the school's administration and Ms. Cain also bore responsibility for the failure. Alesi stated in her deposition that, although Ms. Cain could have raised the issue with Alesi herself, she felt that Ms. Cain had provided K.I. with the services that she was required to provide, and that it was plaintiff's responsibility to ensure that eligible students received ESL instruction.

### 4. *The Alleged Issuance of a Blank Test to a Parent*

On the evening of March 14, 2002, plaintiff held parent-teacher conferences at P.S. 129. According to Alesi, while these conferences were occurring, Alesi encountered Mr. Kahn, a parent of one of plaintiff's ESL students. Alesi stated in her deposition that as she greeted Mr.

Kahn, she noticed that he was carrying a reading lab test, which is a secure document. According to Alesi, upon being asked where he acquired the test, Mr. Kahn replied that plaintiff had given it to him to practice with his son. When Alesi asked Mr. Kahn to give the test to her because Ms. Shums should not have given it out, Mr. Kahn purportedly replied, "Well, I don't want to get her in trouble. Maybe I just picked it up." (Lower Decl. Ex. C.) Alesi then took the test from Mr. Kahn and secured it in her office. Alesi stated that she did not approach plaintiff at the time because she did not want to interrupt her while she was meeting with other parents. In a letter to plaintiff's file dated April 8, 2002, Alesi detailed this incident and reminded plaintiff that secure materials should not be shared with parents. (Barnett Decl. Ex. R.) Plaintiff has consistently maintained that she did not give Mr. Khan a copy of the blank test, and that she does not know how he acquired a copy.

### 6. The April 8, 2002 Classroom Observation

On April 8, 2002, Alesi conducted a classroom observation of plaintiff and detailed her findings in a report dated May 3, 2002. (Barnett Decl. Ex. S.) In her report, Alesi commended plaintiff for breaking her children into groups and seating them at tables to allow for cooperative learning, and for using a graphic organizer in her lesson. Alesi concluded that plaintiff had given an unsatisfactory lesson, however, and recommended that plaintiff give her students more thorough directions, allow them more time to answer questions, avoid asking them confusing questions, and avoid basing her lessons on objects with which most students were unfamiliar. Alesi also criticized plaintiff's classroom environment, noting some general disorganization, and that the student work displayed on plaintiff's bulletin board was outdated.

In a letter dated June 17, 2002, Alesi memorialized a meeting held that day between herself and plaintiff's union representative, at which it was discussed that plaintiff would be

receiving an unsatisfactory rating for the 2001-02 school year because of the observation reports dated December 10, 2001 and May 3, 2002, and the letters to plaintiff's file dated January 7, 2002, February 6, 2002, and April 8, 2002. (Barnett Decl. Ex. T.) The same day, Alesi issued an annual performance review of plaintiff for the 2001-02 school year giving plaintiff an unsatisfactory rating.

D.    The 2002-03 School Year

1.    *The October 17, 2002 Classroom Observation*

Mamounis conducted a formal classroom observation of plaintiff's lesson on October 17, 2002, and detailed her findings in a written report dated November 5, 2002. (Barnett Decl. Ex. V.) In the report Mamounis commended plaintiff's use of photographs as motivational tools, her use of group work to provide her students with an opportunity for interaction and communication, and plaintiff's efforts to circulate around her room and provide her students with individualized assistance as needed. Mamounis had a number of negative comments and suggestions, however, and the report noted a number of problems, including that plaintiff had failed to adapt her lesson so that it was appropriate for students of differing language abilities, that the learning activities plaintiff used were insufficiently structured and explained, that plaintiff's materials were not consistent with the aims of her lesson, and that the activities that plaintiff used with her students did not parallel the activities that plaintiff had anticipated using in her lesson plan. Based on these observations, Mamounis gave plaintiff's lesson an unsatisfactory rating. Mamounis's report cautioned plaintiff that "[i]t is expected that the recommendations from this observation will be implemented to ensure effective teaching," and that "[i]mprovement in the above mentioned areas is imperative." (Barnett Decl. Ex. V.)

### 2.     The February 6, 2003 Classroom Observation

Alesi conducted a formal observation of plaintiff's classroom on February 6, 2003, and detailed her findings in a report that plaintiff received on March 5, 2003.  (Barnett Decl. Ex. X.)  In the report, Alesi noted that plaintiff's students responded well to the poem that plaintiff read them, and seemed happy and non-threatened.  Alesi indicated that plaintiff needed to ensure that her least conversant students were being given appropriate assignments and learning aids, and Alesi also made some suggestions about different materials that plaintiff might use to make her lesson more effective.  Alesi concluded her report by rating plaintiff's lesson as satisfactory.

### 3.     The March 24, 2003 Classroom Visitation

Alesi informally visited plaintiff's classroom on March 24, 2003.  In a letter to plaintiff's file dated March 30, 2003, Alesi criticized the disorganization she observed in plaintiff's classroom.  (Barnett Decl. Ex. Y.)  Alesi noted that when she walked into plaintiff's classrooms, the students were not engaged in any activity, but that upon Alesi's arrival, plaintiff began picking up coins from her desk and asking her students to identify them.  Alesi stated that as plaintiff began questioning her students, she noticed that two students were talking to each other, one student was lying on the floor, and three others had their heads down on their desks.  Alesi states she then asked for the class's attention and refocused their attention to plaintiff.  In her report, Alesi indicated that she believed plaintiff's students had difficulty seeing the coins that were being held up, and that during her lesson, plaintiff answered her own questions, and in so doing, did not afford her students the ability to process her questions or answer them.  Plaintiff disputes that her students were behaving in the manner described in Alesi's letter.

### 4. The March 25, 2003 Fire Drill

In a letter to plaintiff's file dated March 31, 2002, Alesi detailed an incident that occurred on March 25, 2003. On that morning, Alesi had announced over the public address system that there was going to be a dire drill sometime that morning. Plaintiff was scheduled to teach a class of kindergarten students from 9:10 a.m. to 9:55 a.m., but when Alesi was walking on the second floor of the building at approximately 9:30 a.m., she noticed that plaintiff had just returned her kindergarten students to their regular classrooms. When Alesi asked plaintiff why she had returned the children, plaintiff stated she had done so because of the scheduled fire drill. Alesi's letter advised plaintiff that by returning her students to their classrooms early, she had both deprived them the ESL instruction to which they were entitled, and changed her schedule without the approval of a supervisor. Alesi's letter concluded by stating, "This misconduct may lead to further disciplinary action including an unsatisfactory rating, and disciplinary charges being preferred against you, which may lead to your termination." (Barnett Decl. Ex. Z.) Plaintiff disputes that her actions on the day of the fire drill resulted in her students being deprived of ESL instruction because she used her lunch period that day to make up for the missed time.

### 5. The May 14, 2003 Test

On May 23, 2003, Alesi wrote another letter to plaintiff's file detailing an incident that occurred on May 14, 2003. The letter indicates that on 8:45 a.m. that day, plaintiff began administering the listening portion of a state test in which the students would record answers in response to questions posed by a pre-recorded audio tape. Alesi entered plaintiff's classroom at 8:57 a.m. and noticed that several of plaintiff's students were recording their answers in a manner inconsistent with the test's official instructions. Alesi told plaintiff to stop the testing

tape, and asked plaintiff whether she had explained to the students how they should record their answers. According to Alesi's report, plaintiff responded, "I told them to circle the letters while they were in the hall. Some of them were quite confused in the beginning." (Barnett Decl. Ex. AA.) The report states that Alesi then demonstrated the correct procedures to plaintiff's students and that the students continued listening to the tape to complete the test. Alesi's report concluded by telling plaintiff that standardized testing procedures must be followed, and by again warning plaintiff that her misconduct might lead to disciplinary action, including an unsatisfactory annual rating and, ultimately, termination.

6.      *The June 9, 2003 Classroom Observation*

In a letter dated June 2, 2003, Iannizzi, Special Assistant to the Superintendent of the District, informed plaintiff that plaintiff would be receiving an unsatisfactory rating for the 2002-03 school year, her second consecutive unsatisfactory rating, and the Superintendant had designated Iannizzi to visit plaintiff's classroom on June 9, 2003. (Lower Decl. Ex. 5.) On June 9, Iannizzi performed a formal classroom observation of plaintiff and found plaintiff's lesson to be unsatisfactory. In her report dated June 16, 2003, Iannizzi commended plaintiff for her preparation and for her warm relationship with her students, but found problems with plaintiff's teaching methods—in particular, plaintiff's organization, her failure to allow her students to respond meaningfully to her questions before she answered them herself, and her failure to differentiate instruction to accommodate the different ability levels of the students in her class. (Barnett Decl. Ex. BB.) Iannizzi later stated that it was official protocol for a representative of the Superintendent's Office to observe any teacher in danger of receiving an unsatisfactory rating, and that she had performed approximately fifty classroom observations pursuant to a

principal's announced intention to issue a teacher an unsatisfactory rating. Iannizzi could not recall ever giving a satisfactory rating in such a situation. (Iannizzi Dep. 82-83.)

In a letter to plaintiff dated June 18, 2003, Alesi memorialized a meeting that she had with plaintiff on that day at which she advised plaintiff that plaintiff would be receiving an unsatisfactory rating for the 2002-03 school year based upon plaintiff's performance for the year, two unsatisfactory observations, various letters to file, and plaintiff's repeated absences, which caused deprivation of instruction to her students. (Barnett Decl. Ex. CC.) In plaintiff's annual performance review for the 2002-03 school year, Alesi gave plaintiff an unsatisfactory rating. On or about June 26, 2003, plaintiff was given a letter that directed her to meet with District 25 Superintendent Judith Chen on the first day of the 2003-04 school year.

E.      Plaintiff's Disciplinary Hearing and Termination

On the first day of the 2003-04 school year, plaintiff reported to the district office and was told to sit with the other teachers who, for whatever reasons, had been removed from their classrooms in District 25. (Shums Dep. 131.) On or about that time, plaintiff was suspended with pay. After reporting to the district office for several months, on or about November 17, 2003, plaintiff was served with disciplinary charges. Eleven specifications were brought against plaintiff under N.Y. Education Law § 3020-a. The specifications dealt with three basic categories of alleged substandard performance: (1) unsatisfactory formal classroom observations on November 9, 2001, April 8, 2002, and June 9, 2003, as well as an unsatisfactory informal observation on March 24, 2003; (2) excessive absences during the 2002-03 school year; and (3) five separate charges of inappropriate conduct—(a) failing to include K.I. in the ESL program during the first half of the 2001-02 school year, (b) two specifications arising on March 14, 2002 regarding the disclosure of tests and test scores, (c) returning students to their classrooms on

early on March 25, 2003 and depriving them of ESL services, and (d) giving improper testing instructions to students on May 14, 2003.

In accordance with New York Education Law § 3020-a, a hearing before Hearing Officer Ben Falcigno was held over the course of fifteen days between January 21, 2004 and April 16, 2004 (the "3020-a proceeding"). Plaintiff was represented by counsel throughout the hearing and had the opportunity to submit briefs, testify on her own behalf, introduce evidence, and cross-examine the school district's witnesses. In a decision dated July 19, 2004, the hearing officer found that all of plaintiff's unsatisfactory ratings were supported. He felt, however, that while plaintiff's "failures of methodology . . . [were] very serious . . . there [was] not quite sufficient proof of incompetence to justify termination for those pedagogic failures demonstrated in the unsatisfactory observations," because "there were also, during the time period at issue, approximately as many satisfactory observations, showing that Shums had the potential to satisfy the administration's definition of competent performance in the classroom." (Barnett Decl. Ex. DD at 34.) The hearing officer nevertheless found termination justified because, in addition to the problems with plaintiff's instruction, plaintiff had committed "serious violations . . . which constitute conduct unbecoming a teacher and misconduct" when she failed to provide ESL instruction to K.I. and dispensed a blank copy of a test to Mr. Khan. (*Id*.) Finding that no mitigating factors outweighed plaintiff's poor performance, the hearing officer accepted the District's decision to terminate plaintiff from her teaching position. Finding that the justification for termination was established without considering the issue of plaintiff's absenteeism, the hearing officer declined to consider what weight, if any, needed to be given to that issue. Plaintiff was terminated on or about September 15, 2004.

F.      Plaintiff's Allegations

Plaintiff alleges that her suspension and ultimate termination resulted from the animus that Alesi bore towards plaintiff because of plaintiff's national origin, and that the increased scrutiny of plaintiff that led to plaintiff's suspension and termination was unlawful retaliation for plaintiff's October 14, 2001 letter in which she complained about her ESL teaching schedule. Defendants dispute plaintiff's allegations and argue that they are entitled to summary judgment because, *inter alia*, there is no evidence in the record to support plaintiff's claim of national origin discrimination and plaintiff's retaliation claims fail as a matter of law.

## II.    Discussion

A.      Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), but must affirmatively "set out specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e). "When no rational jury could find in

favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

Moreover, "[t]he Second Circuit has stated that district courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Figueroa v. New York Health and Hospitals Corp.*, 500 F. Supp. 2d 224, 227-28 (S.D.N.Y. 2007) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks omitted)). Summary judgment in an employment discrimination case may still be warranted, however, if the plaintiff relies "'on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct' . . . because, as the Second Circuit has stated, '[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'" *Id.* (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *Tojzan v. New York Presbyterian Hosp.*, No. 00 Civ. 6105, 2003 WL 1738993, at *4 (S.D.N.Y. Mar. 31, 2003)).

B.    Title VII National Origin Discrimination

Under Title VII, it is "an unlawful employment practice for an . . . employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail against a motion for summary judgment, a

discrimination plaintiff must satisfy the three-part burden-shifting test laid out by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "In a nutshell, a plaintiff first bears the 'minimal' burden of setting out a *prima facie* discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a 'legitimate, nondiscriminatory reason' for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination. *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citations omitted). To establish a *prima facie* case of discrimination, plaintiff must demonstrate that: (1) she is a member of a protected class, (2) her job performance was satisfactory, (3) she suffered an adverse employment action, and (4) the action occurred under conditions giving rise to an inference of discrimination. *See, e.g.*, *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006).

Plaintiff's Title VII claim cannot survive summary judgment because the record fails to establish that plaintiff's suspension and termination occurred under conditions giving rise to an inference of national origin discrimination. Plaintiff alleges that defendants' decision to suspend and terminate her was motivated by Alesi's animus against plaintiff on the basis of plaintiff's national origin. In support of this claim, plaintiff notes that Alesi "knew plaintiff to be Muslim, to speak Urdu, and to always wear long dresses and a veil over her hair." (Pl.'s Mem. Opp. 1.) Plaintiff alleges that Alesi betrayed her animosity towards plaintiff's national origin through the following actions and statements:

- In October 2000, defendant Alesi criticized plaintiff for closing her eyes during a staff development presentation. Defendant Alesi told plaintiff that she had to look at people while they were talking, that she was going to check to see if her students were following the "norms," and complained that if plaintiff did not "practice the correct behavior of making eye contact" she would not be able to teach it to her students.
- Following the meeting, up until February 2001, defendant Alesi frequently called plaintiff into her office in the morning. In these encounters, defendant

Alesi demanded again and again that plaintiff not take her eyes off her face when she spoke to plaintiff. Defendant Alesi stated that as an ESL teacher, "plaintiff was supposed to teach the students 'this culture's norms, this culture's behavior.'"

- During the months between October 2000 and February 2001, defendant Alesi repeatedly brought up the subject of culture and norms. She asked plaintiff rhetorical questions such as "how can you be an ESL teacher, if you cannot follow the norms of this culture yourself? How can you teach it to the students?" She also said words to the effect that she would go into plaintiff's [classroom] "to see that you are teaching them the proper norms."

- On many occasions, defendant Alesi followed plaintiff as she moved her students through the hallways, and she interrupted plaintiff as plaintiff gave directives to the children. Defendant Alesi would say, "this is not how we do it here. This is not the way it's done. This is how you say it."

- In October 2001, defendant Alesi called plaintiff to a meeting regarding plaintiff's questions about the ESL schedule defendant Alesi had prepared. Defendant Alesi jabbed her finger at plaintiff's chest while saying, "you can't even read" and "you don't know how to read."

(Pl. Mem. Opp. 5.) When viewed in the context of the entire record, these alleged statements fail to give rise to an inference that plaintiff was suspended and terminated because of her national origin.

In regards to the interactions between Alesi and plaintiff concerning plaintiff's failure to make eye contact, plaintiff's depiction fails to accurately portray the events that occurred. At the October 2000 staff development meeting in question, plaintiff intentionally closed her eyes because she found it strenuous to turn her neck and focus her eyes upon the speaker. Plaintiff's decision to rest her eyes during the presentation, by plaintiff's own admission, had nothing to do with plaintiff's culture or natural origin. Apparently one of the other attendees at the presentation complained to Alesi about plaintiff's behavior, which led Alesi to call plaintiff into her office for a meeting. Plaintiff fails to point to anything at all in that meeting with Alesi, apart from Alesi's ambiguous use of the word "norms," that possibly could be construed as evidencing an animus against plaintiff's national origin. Alesi's alleged statements over the next several

months regarding appropriate behavior in "this culture" are also ambiguous but would appear to lend some support to plaintiff's argument except that Alesi promptly desisted from making such statements—in February 2001—when plaintiff stated that it was against her religious beliefs to make eye contact. Moreover, plaintiff's affidavit suggests that she did not actually hold such a belief, but just told Alesi that she did "[i]n an attempt to get her to stop." (Shums Aff. ¶ 14.)

As for Alesi's statements such as "this is how we do it here," such statements are ambiguous at best, and nothing plaintiff states about the context in which they were made establishes an inference of discriminatory bias. Alesi's alleged statement to plaintiff in October 2001—that plaintiff "can't even read"—is harsh, and perhaps, even unprofessional, but is likewise subject to a variety of interpretations. For example, Alesi could have been expressing her frustration with plaintiff over plaintiff's inability to understand what Alesi believed were clear instructions. In sum, these few ambiguous statements, made in 2000 and early 2001, fail to raise an inference that plaintiff's suspension in 2003 and subsequent termination resulted from national origin discrimination. *See Gordon v. Health & Hospitals Corp.*, No. 06-CV-1517, 2008 WL 924756 at *8 (E.D.N.Y. Mar. 31, 2008) (citing *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998); *Douglas v. Dist. Council 37 Mun. Employees Fund Trust*, 207 F. Supp. 2d 282, 291 (S.D.N.Y. 2002)). Accordingly, plaintiff has failed to establish a *prima facie* case of national origin discrimination, and her Title VII claim must be dismissed.[2]

---

[2] Plaintiff asks the Court to evaluate her discrimination claim under a "mixed motive" analysis pursuant to *Price Waterhouse v. Hopkins*, 490 U.S. 228. Plaintiff, however, could only prevail on a mixed motive theory if she presented "evidence that 'directly reflects' a discriminatory motivation, like 'policy documents and evidence of statements of actions by decisionmakers' that constitute a 'smoking gun' or, at the very least, a 'thick cloud of smoke.'" *Vahos v. General Motors Corp.*, No. 06-CV-6783, 2008 WL 2439643 at *5 n.5 (E.D.N.Y. Jun. 16, 2008) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 60-61 (2d Cir. 1997)). Plaintiff has presented no such evidence, and thus, her claim fails under a mixed motive analysis as well.

C.     First Amendment Retaliation Claim

Plaintiff also claims that her suspension and termination were retaliation for the October 14, 2001 letter that she wrote, addressing perceived problems in the ESL instruction schedule at P.S. 129. A plaintiff asserting a First Amendment retaliation claim must establish: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). If a plaintiff successfully establishes these elements, the government may escape liability if it can establish "by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech . . . ." *Mandell v. The County of Suffolk*, 316 F.3d 368, 382-83 (2d Cir. 2003) (quoting *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001)).

In its March 31, 2006 decision, the Court found that: (1) plaintiff's October 14, 2001 letter constituted protected speech, (2) plaintiff's suspension and termination constituted adverse employment actions, and (3) in light of plaintiff's *pro se* status at the time of the decision, and pursuant to the pleading standard then in effect,[3] plaintiff had sufficiently pled causation. *Shums*, No. 04-CV-4589, slip. op. at 6-10. While nothing in the record convinces the Court to depart from its earlier finding that plaintiff's suspension and termination constituted adverse employment actions, the United States Supreme Court's opinion in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which was decided one day prior to the Court's March 31, 2006 decision in this case, forces the Court to revisit whether plaintiff's letter is constitutionally protected speech.

_____

[3] The Court's decision was issued prior to the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, which retired the standard set forth half a century ago in *Conley v. Gibson*, that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," in favor of the requirement that plaintiff plead enough facts to "state a claim to relief that is plausible on its face." *Bell Atlantic*, 127 S. Ct. 1955, 1968-69, 1974 (2007) (quoting *Conley*, 355 U.S. 41, 45-46 (1957)).

The Court must also consider whether genuine issues of material fact exist concerning the causation element of plaintiff's claim.

Turning first to consideration of the Supreme Court's decision in *Garcetti*, this court now holds that plaintiff's October 14, 2001 letter did not constitute protected speech. When a public employee speaks pursuant to her official duties, rather than as a citizen, the statement is excluded from First Amendment protection and the employer can retaliate against the employee on the basis of that speech. *Garcetti*, 547 U.S. at 421; see also *Weintraub v. Board of Educ. of the City of New York*, 489 F. Supp. 2d 209, 215 (E.D.N.Y. 2007) (holding that though touching upon a matter of public concern, a school teacher's comments regarding classroom safety and the filing of a formal grievance was not protected speech because the teacher "was speaking as an employee, proceeding through official channels to complain about unsatisfactory working conditions").

In this case, statements made in plaintiff's October 14, 2001 letter fell within the scope of her duties as an ESL teacher. First, while some of plaintiff's statements may touch on matters of public concern, they were directed only to her superiors within the school and district. Plaintiff's letter was an internal communication, sent directly Mamounis, the ESL supervisor for District 25. Plaintiff also sent a carbon copy of the letter to Alesi, the school principal, and Michelle Fratti, the Superintendent of District 25. *See Weintraub*, 489 F. Supp. 2d at 219-20. Additionally, the letter stated that the schedule did not provide plaintiff's students with the legally required amount of instruction because it failed to account for the time it took to pull students out of their regular classrooms and situate them in plaintiff's instruction area. In her deposition, plaintiff stated that her duties as an ESL teacher required her to ensure that her students received the requisite amount of state-mandated ESL instruction. Later, in an affidavit

submitted in opposition to the present motion, plaintiff clarified that, although she saw it as her "moral duty" to help her students in any way that she could, she "was never advised by the defendants that [she] was required as part of her official duties to report violations of the [ESL program requirements] to the District's central administration." (Shums Aff. ¶ 27.) Plaintiff's subjective believe as to which duties were "official" and which duties were "moral" are not relevant.

> Formal job descriptions often bear little resemblance to the duties an employee is *expected* to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti*, 547 U.S. at 424-25 (emphasis added). As an ESL teacher, plaintiff's duties included making sure that students received the requisite ESL instruction, as well as assisting students with the more practical need of traveling between classrooms effectively. Finally, though some of plaintiff's statements may touch upon matters of public concern, the problems raised were borne out of challenges faced by a tight teaching schedule. This concern is administrative in nature, and weighs further in favor of the holding that plaintiff's letter was written as an employee. Thus, plaintiff's speech is not afforded constitutional protection.

Even if the Court were to find that plaintiff's letter was subject to constitutional protection, plaintiff fails to assert a genuine issue of material fact with respect to the causation element of a First Amendment retaliation claim. To establish causation in a First Amendment retaliation claim, "[t]he causal connection must be sufficient to support the inference that the speech played a substantial part in the employer's adverse employment action." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir. 2000). The Second Circuit has also held that "[c]ausation can be established either indirectly by means of circumstantial evidence, for

example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003).

Defendants' motion for summary judgment on plaintiff's First Amendment retaliation claim is granted because the record establishes that no genuine issue of material fact exists as to whether plaintiff's October 14, 2001 letter was a substantial factor in her suspension and termination and because there is ample evidence that, absent plaintiff's letter, she would have been terminated anyway. In support of its motion, defendants argue that "the passage of time and defendants' actions defeat any showing of causation." (Defs.' Mem. Supp. 18.) Defendants' note that "almost two years passed between plaintiff's October 14, 2001 letter and the initiation of disciplinary proceedings." *Id.* Defendants further state that "such action would have been taken irrespective of plaintiff's letter . . . ." (Defs.' Mem. Supp. 19.) In making that argument, defendants rely upon a documented record of unsatisfactory performance evaluations and instances of plaintiff's misconduct. Finally, defendants maintain that Alesi was critical of plaintiff's work prior to the October 14, 2001 letter. (Defs.' Mem. Supp. 19-20.)

In contrast, plaintiff maintains that a reasonable jury could find a causal connection based on evidence of both retaliatory animus and temporal proximity. First, plaintiff argues that direct evidence of retaliatory animus precludes the Court's grant of summary judgment in favor of the defendants. (Pl.'s Mem. Opp. 20-21.) On that score, plaintiff notes that during Alesi's deposition, she stated that plaintiff's letter was "outrageous," "comical" and "invalid in many ways." (Alesi Dep. 73.) Accordingly, plaintiff argues, these feelings influenced Alesi's subsequent treatment and professional evaluation of her. (Pl.'s Mem. Opp. 17-18.) Plaintiff asserts that hostility expressed by Alesi during a December 18, 2001 meeting with plaintiff and

Mamounis, stemmed from the plaintiff's October 14, 2001 letter. (Pl.'s Mem. Opp. 18.) During that meeting, plaintiff attempted to take notes. Alesi is alleged to have yelled at plaintiff, telling her to "put that pen down and stop writing" and alleged to have stated, "I'm going to call up my attorney. And if you misquote me, I will sue you." (Shums Aff. ¶ 30.)

Though the language that Alesi is alleged to have used during this meeting is highly unprofessional, a rational jury could not find that Alesi's comments evidence retaliatory animus. The purpose of this meeting was to design a plan to assist plaintiff in preparing and implementing an instructional program that would meet the needs of plaintiff's students more effectively. Following the meeting, that plan, developed by Alesi and Mamounis, was communicated to plaintiff via letter. The letter indicated that the District's ESL specialist would be assigned to work with plaintiff in weekly meetings to assist plaintiff in planning her lessons. The letter also indicated that those meetings would concern "differentiating instruction to meet the needs of [plaintiff's] English language learners (ELLs)" and creating "strategies for facilitating the development of listening and speaking skills for ELLs." (Barnett Decl. Ex. O.) Finally, the letter instructed plaintiff to attend several school-sponsored educational workshops and notified plaintiff that Mamounis would conduct a formal observation of plaintiff's class on February 15, 2002. Plaintiff was offered opportunities to improve her abilities in the classroom after sending her letter. Thus, contrary to plaintiff's claims of retaliatory animus, the record indicates that despite two professional development plans, as well as numerous evaluations performed by three separate reviewers, plaintiff failed to ameliorate what was perceived by superiors to be substandard performance; plaintiff resisted embracing constructive criticism and did not incorporate the recommendations set forth in written evaluations of her performance.

Furthermore, by plaintiff's own account, Alesi is alleged to have treated her with hostility before she sent the letter. For example, in March 2000, plaintiff asserted that Alesi approached her in the teacher's lounge and asked, "What are you doing Ms. Shums?" in an accusatory tone which caused plaintiff to be "absolutely taken aback." (Shums Dep. 91.) In addition, plaintiff accused Alesi of "berating" and verbally "attacking" her during an October 2000 meeting, when she allegedly stated that plaintiff "was not fit to be an [ESL] teacher." (Shums Dep. 244-45.) That meeting resulted in a performance development plan for plaintiff. Finally, plaintiff alleged that around October 3, 2001, shortly before she sent the letter, Alesi jabbed her finger on a printed schedule close to plaintiff's chest stating something similar to, "You can't even read. You don't even know how to read." (Shums Aff. ¶ 20.) These facts, if taken as true, establish that plaintiff's relationship with Alesi was acrimonious before she sent the October 14, 2001 letter and undermine any notion that the letter triggered First Amendment retaliation against her.

Regarding the claim of temporal proximity, plaintiff argues that less than one month passed after plaintiff sent the October 14, 2001 letter until plaintiff received the first unsatisfactory performance review of her almost thirteen-year teaching career. Plaintiff also states that this performance review, made on November 9, 2001, set into motion a process which ultimately lead to plaintiff's suspension and termination less than two years later, a process which took no longer than the minimum amount of time necessary to carry out such action. (Pl.'s Mem. Opp. 20-21.) Plaintiff's arguments are unpersuasive.

The court recognizes that the Second Circuit has not established a specific period of delay between protected activity and adverse employment action that defeats an inference of causation. *Burkybile v. Bd. of Educ.*, 411 F.3d 306, 314 (2d Cir. 2004). The court also takes note that the Second Circuit has found that a delay of only three months was fatal to a showing of causation.

*Id.* Though plaintiff seeks to establish the causal connection through claims of both temporal proximity and retaliatory animus on the part of Alesi, as discussed above, plaintiff's allegations of retaliatory animus are without merit.

The record establishes that Alesi believed plaintiff's classroom performance barely met expectations before she sent the October 14, 2001 letter. An April 5, 2000 evaluation indicates that plaintiff's performance was "a marginally satisfactory lesson, which merits a satisfactory rating." As noted above, Alesi was critical of plaintiff prior to her receipt of the October 14, 2001 letter, and that plaintiff required professional development during the previous school year. Mamounis also performed an unofficial classroom observation of plaintiff before October 2001. Plaintiff's claim of temporal proximity is also unavailing because, though she received her first unsatisfactory evaluation less than one month after she sent the letter, during the remainder of the 2001-2002 school year and throughout the 2002-2003 school year, plaintiff received both satisfactory and unsatisfactory performance evaluations from three separate reviewers.

Finally, the record provides ample evidence that plaintiff would have been terminated absent her unsatisfactory performance evaluations. Plaintiff was accused of failing to provide instruction to a student in need of ESL teaching and of providing a student's father with a copy of a blank exam. During plaintiff's disciplinary hearing, the Hearing Officer determined that while plaintiff's classroom performance was deficient in some respects, termination was justified because plaintiff had committed "serious violations . . . which constitute conduct unbecoming a teacher and misconduct" when she failed to provide ESL instruction to K.I. and dispensed a blank copy of a test to Mr. Khan." (Barnett Decl. Ex. DD at 34.)

Based on the foregoing, the court finds that plaintiff has not set forth a *prima facie* First Amendment retaliation claim and that no question of material fact remains as to whether the

alleged actions taken by Alesi, on her own and through surrogates, namely, Mamounis and Iannizzi, would have been carried out against plaintiff absent her October 14, 2001 letter.

## III.    Conclusion

For the reasons set forth above, defendants' motion for summary judgment with respect to the plaintiff's Title VII claim is granted.  The court finds that plaintiff also has failed to set forth sufficient evidence to present a *prima facie* First Amendment retaliation claim under Section 1983 because her letter was not protected speech, and even if it was, plaintiff has failed to raise a genuine issue of material fact with respect to the causation element of that claim. Therefore, defendants' motion for summary judgment is granted in its entirety.


SO ORDERED.

DATED:      Brooklyn, New York
                 March 17, 2009


_____/s/_____
                    DORA L. IRIZARRY
                  United States District Judge